[No. D054810. Fourth Dist., Div. One. Dec. 16, 2010.]

P&D CONSULTANTS, INC., Plaintiff, Cross-defendant and Appellant, v. CITY OF CARLSBAD, Defendant, Cross-complainant and Appellant.

1334

**COUNSEL**

Niddrie, Fish, Buchanan, David A. Niddrie; Vivoli & Associates, Michael W. Vivoli and Jason P. Saccuzzo for Plaintiff, Cross-defendant and Appellant.

Gatzke Dillon & Ballance, Anthony T. Ditty and Stephen F. Tee for Defendant, Cross-complainant and Appellant.

## Opinion

**McCONNELL, P. J.**—This breach of contract action arises from a written agreement between P&D Consultants, Inc. (P&D), and the City of Carlsbad (the City) for services pertaining to a redesign of the City's municipal golf course. In its appeal, the City contends that as a matter of law, the jury's award of $109,093.81 to P&D for extra work cannot stand because there was no written change order, in violation of provisions of the contract and public contract law (Gov. Code, § 40602). In conjunction with this contention, the City asserts the court erred by instructing the jury that the contract could be modified orally or through the parties' conduct. Alternatively, the City challenges the sufficiency of the evidence to support the award.

We reverse the judgment on the first amended complaint (hereafter complaint) based on the contract's requirement of a written change order. Unlike private contracts, public contracts requiring written change orders cannot be modified orally or through the parties' conduct. Thus, even if P&D's evidence pertaining to the oral authorizations of a city employee for extra work is fully credited, P&D cannot prevail. The court erred by submitting the matter to the jury; it should have granted the City's motion for nonsuit. Because the contract issue resolves the matter, we need not address Government Code section 40602[1] or the sufficiency of the evidence.

Additionally, as to its cross-complaint against P&D for defective and incomplete work, the City contends the court erred by excluding certain testimony of a nonretained expert and of a retained expert. To any extent there was error, however, the City has not satisfied its burden of showing any miscarriage of justice to warrant reversal.

In its appeal, P&D concedes we should affirm the judgment of $6,614.69 against it on the City's cross-complaint for defective or incomplete work. Insofar as P&D's complaint is concerned, P&D contends the court erred by granting nonsuit on the complaint's causes of action for quantum meruit and breach of implied contract, by granting a directed verdict on the cause of action for violation of prompt payment statutes, and by denying it leave to amend to allege causes of action for breach of the implied covenant of good faith and fair dealing and "breach of the duty to negotiate in good faith." P&D asserts that if we reverse the judgment on the complaint, we must remand the matter to the trial court for a new trial to include these claims. We conclude remand on the complaint is not warranted under any theory.

---

[1] Government Code section 40602 requires that the mayor or another officer designated by ordinance sign "[a]ll written contracts and conveyances made or entered into by the city." (Gov. Code, § 40602, subd. (b); see *id.*, subd. (c).) The parties differ on whether the statute applies to change orders and it appears there is no published opinion on the issue.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Contract Documents*

On April 9, 2004, the parties entered into a written contract under which P&D was to provide civil engineering and other services for the redesign of the City's municipal golf course project to satisfy numerous conditions the California Coastal Commission imposed. The contract defines the scope of work and specifies a contract price of $556,745. The contract also provides that no amendments, modifications, or waivers of contract terms will be allowed absent a written agreement signed by both parties. Further, the contract includes an integration clause that states the contract and any written amendments thereto embody the parties' entire agreement.

At the City's initiation, the parties entered into written "Amendment Nos. 1 through 4," which increased the contract price by a total of $63,525.50 for extra work. In each instance, P&D submitted a proposed change order with a fixed price to the City's project manager, John Cahill, and he provided the City with the information for its preparation of an amendment. The City typically took several weeks to execute an amendment, and Cahill frequently authorized P&D to begin extra work before it received an executed amendment.

Written "Amendment No. 5" arose from the parties' negotiations. P&D's project manager, Charles Moore, raised concerns about work he believed was beyond the scope of work delineated in the written contract documents. In early 2005, Cahill notified Moore that the City had "finally reached resolution on what we expect to be the final changes for the golf course per the Coastal Commission." Cahill asked Moore to "prepare a complete and final projected scope of work and scope of cost to finish out all of the activities to complete the plans and specs." P&D sought an additional $209,956, which included $69,073 for extra work already performed and $139,833 for the cost "to complete services for final plan submittal and City approval."

Cahill objected to the proposal on the grounds the amount was excessive, it included charges for work already specified in the written contract documents, and it exceeded the maximum sum the City had set for completion of the project. In an e-mail to Moore, Cahill wrote: "[W]e have limits for both

our purchase order authority and this proposed Amendment No. 5. We are now at those limits. No further costs will be authorized nor should be to finish these design packages." Cahill indicated to Moore that "the breakdown of costs still needs to get below $100k [($100,000)]."

As finally approved, Amendment No. 5 authorized work on a time and materials basis for a maximum of $99,810. As was customary, at Cahill's direction P&D began the work several weeks before the City executed the amendment.

Amendments Nos. 1 through 5 included this language: "All other provisions of the Agreement, as may have been amended from time to time, will remain in full force and effect." Additionally, Amendment No. 5 states: "It is the intent of the Parties that Amendment No. 5 shall provide all final and complete services by Contractor to City required to produce the final, approved, signed, and complete sets of plans, specifications, and estimates required by City to bid the Project. City will pay Contractor for all work associated with those services described in Exhibit 'A' on a time and material basis not-to-exceed . . . $99,810. Contractor will provide City, on a monthly basis, copies of invoices sufficiently detailed to include hours performed, hourly rates, and related activities and costs for approval by City. No additional compensation shall be requested by Contractor nor shall be approved by City related to this scope of work."

B. *Complaint and Cross-complaint*

P&D sought yet more pay from the City, ostensibly for work not included in Amendment No. 5. When the City refused to pay, P&D sued it for breach of written contract, breach of implied contract, quantum meruit and violation of prompt payment statutes (Pub. Contract Code, §§ 7107, 20104.50; Civ. Code, § 3320), seeking to recover an amount exceeding $109,093.31. The City cross-complained against P&D for breach of contract on the ground of deficient and incomplete work.

C. *Trial*

P&D's trial theory was that the contract's written change order requirement was modified by Cahill's oral authorization of the extra work for which it sought payment, and by the parties' conduct in handling Amendments Nos. 1 through 5. The material evidence on the procedure followed for the written amendments was not in conflict. Since we decide this case on a legal issue, we only summarize the conflicting evidence as to whether Cahill orally authorized the extra work at issue.

Cahill testified as follows. After P&D submitted its proposal for Amendment No. 5 to the City, P&D began seeking payment for extra work it

claimed was beyond the scope of that amendment. Moore threatened that if the City did not pay the additional amount, P&D would discontinue work. In Cahill's view, the work was not extra, but rather was included in Amendment No. 5. He believed Amendment No. 5 "was a complete, final projection of all costs and work by P&D and their sub-consultants to complete the project. [¶] That's what was negotiated." Cahill nonetheless told Moore, "[I]f you feel strongly . . . that you've got additional work outside of the contract and the amendments, put it together with the proper back-up and the City will evaluate it." Cahill denied preparing a sixth amendment, and he did not recall whether he told Moore he would do so.

Moore testified as follows. Cahill told him the City was running out of funds for the project, and when Moore objected to P&D continuing with extra work, he told Moore to keep working and that he would "take care of it." Per Cahill's request he provided the City with spreadsheets showing P&D's extra work costs, and Cahill told Moore he was in the process of preparing a sixth amendment to the contract. He phoned Cahill to check on the status of the amendment, and Cahill told him it had been prepared and "was in accounting." Moore phoned the City's accounting department and was told "there was no such item."

After the presentation of P&D's evidence, the City moved for nonsuit on the ground that as a matter of law P&D could not recover for extra work without a written change order. The court granted the motion on the causes of action for quantum meruit and implied contract, but denied the motion on the causes of action for breach of contract and violation of prompt payment statutes. The court determined that while public contracting law typically prohibits oral contracts, P&D had the right to argue the parties' conduct modified the written change order requirement.

At the close of evidence, the City moved for a directed verdict, arguing there was no legal or factual basis for a finding in P&D's favor. After taking the matter under submission, the court issued a tentative decision granting the motion as to the breach of contract and prompt payment claims. The court found that as a legal matter a public contract may be modified by the parties' conduct, but there was no factual basis for finding a modification here. The court noted the procedure for Amendments Nos. 1 through 5 required that P&D submit a proposal for the scope of work with a fixed fee, but that procedure was not followed for its extra work claim and as "what the law abhors occurred. [P&D] was left to perform work with absolutely no prior description to the City, perform work with no pre-stated cost to the City. Left unchecked, [P&D] ran up a bill over $109,000."

At the hearing, P&D encouraged the court to allow the matter to go to the jury as a "close call," after which the court could grant judgment notwithstanding the verdict (JNOV) if it wished. The court questioned whether the evidence of modification was sufficient to go to the jury. The court ultimately denied the motion for directed verdict as to the breach of contract claim, explaining it had "every reason to believe that should the jury come back for the plaintiff, [the verdict] would probably be taken away with a [JNOV]." The court did grant a directed verdict on the prompt payment claim.

During discussions on jury instructions, the City again argued P&D could not recover for extra work without a written change order. The court disagreed and rejected the City's proposed jury instructions on public contract law. The court explained: "I think the plaintiff has a very real argument about modification, which is why I have agreed to the modification jury instruction. And I understand where you believe a writing is required. A writing was always done for the most part as far as the parties were concerned, amendments 1 through 5; it's just the timing—this is more of a timing case than a writing . . . kind of issue." The court instructed the jury as follows:

"P&D . . . claims that the original contract was modified, or changed. P&D . . . must prove that the parties agreed to the modification. [The] City . . . denies that the contract was modified.

"The parties to a contract may agree to modify its terms. You must decide whether a reasonable person would conclude from the words and conduct of P&D . . . and [the] City . . . that they agreed to modify the contract. You cannot consider the parties' hidden intentions.

"A contract in writing may be modified by an oral agreement to the extent the oral agreement is carried out by the parties."

On the complaint, the jury found the City liable for breach of contract and awarded P&D the full amount of damages it requested, $109,093.81. On the cross-complaint, the jury found P&D liable for breach of contract and awarded the City $6,614.69.

The City then brought motions for JNOV and a new trial. The trial judge could not appear at the hearing, and the minute order stated the motions were denied by operation of law. Judgment was entered on January 22, 2009.[2]

---

[2] In addition to appealing the judgment, the City purports to appeal the order denying its motion for JNOV. That order, however, is subsumed in the judgment.

## DISCUSSION

### I

### *P&D's Breach of Contract Claim Lacks Merit as a Matter of Law*

#### A

The City contends we must reverse the judgment for P&D because as a matter of law, it cannot recover for extra work without a written change order, as the parties' contract requires. The City asserts the court erred by finding the contract could be modified orally or through the parties' conduct in handling Amendments Nos. 1 through 5, by allowing the matter to go to the jury on that theory, and by denying the City's motion for nonsuit. We agree.

■ "Contract interpretation presents a question of law which this court determines independently." (*Ben-Zvi v. Edmar Co.* (1995) 40 Cal.App.4th 468, 472 [47 Cal.Rptr.2d 12].) " ' "The fundamental goal of contractual interpretation is to give effect to the mutual intention of the parties." [Citation.] "Such intent is to be inferred, if possible, solely from the written provisions of the contract." [Citation.] "If contractual language is clear and explicit, it governs." [Citation.]' " (*Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390 [33 Cal.Rptr.3d 562, 118 P.3d 589].)

The City relies principally on *Katsura v. City of San Buenaventura* (2007) 155 Cal.App.4th 104 [65 Cal.Rptr.3d 762] (*Katsura*), and we find it persuasive.[3] In *Katsura*, an engineer (Katsura) and the City of San Buenaventura entered into a contract for consultant services for a maximum price of $18,485. (*Katsura, supra,* 155 Cal.App.4th at p. 106.) "The contract required that any modifications were only to be made by mutual written consent of the parties." (*Ibid.*) The city paid Katsura's first two invoices, which totaled $15,565. (*Id.* at pp. 106–107.) After completion of the project, Katsura submitted a final invoice for an additional $23,743.75, which the city refused to pay "because it was beyond the maximum contract price and included work that was not authorized by the contract." (*Id.* at p. 107.) Katsura sued the city for breach of contract and common counts. He admitted he did not follow the contract's written modification requirement, but argued the contract was orally modified to include extra work based on requests by the city's associate engineer and an outside consultant. (*Katsura,* at p. 108.)

---

[3] We deny the City's request, which P&D opposes, that we take judicial notice of the appellant's briefing in the *Katsura* case.

■ The court held the concept of oral modification was inapplicable, explaining: "Persons dealing with a public agency are presumed to know the law with respect to any agency's authority to contract. [Citation.] ' "One who deals with the public officer stands presumptively charged with a full knowledge of that officer's powers, and is bound at his . . . peril to ascertain the extent of his . . . powers to bind the government for which he . . . is an officer, and any act of an officer to be valid must find express authority in the law or be necessarily incidental to a power expressly granted." ' " (*Katsura, supra*, 155 Cal.App.4th at p. 109.)

Further, the court explained, "There is no provision in the City charter for execution of oral contracts by employees of the City who do not have requisite authority. The alleged oral statements by the associate city engineer and project manager are insufficient to bind the City. ' "No government, whether state or local, is bound to any extent by an officer's acts in excess of his . . . authority." ' " (*Katsura, supra*, 155 Cal.App.4th at p. 109.) The court added, "We are not unsympathetic to the seeming unfairness of denying payment for work done in good faith by one who has no actual knowledge of the restrictions applicable to municipal contracts." (*Id.* at p. 111.) The court noted, however, that Katsura was not the victim of an innocent mistake, as he was aware of the public contracting procedure and that the extra work was outside the scope of the contract. (*Ibid.*)

■ P&D attempts to distinguish *Katsura* on the ground it "involve[s] restrictions on the *creation* of public contracts" rather than modifications to public contracts. (Original italics.) P&D submits that *Katsura* is not authority for what it deems the City's "astonishing suggestion that a public contract cannot be *amended* except by written instrument." (Original italics.) P&D has the facts wrong. As discussed, the parties had a written contract and Katsura sought payment for extra work authorized orally. In other words, he sought to enforce an oral *modification* to the contract. The facts of *Katsura* are apposite. Further, while *Katsura* does not involve the issue of whether a written modification requirement in a public contract can be modified through the parties' *conduct*, its reasoning applies equally to modification through conduct. Whether a claimed modification is oral or through conduct, the party contracting with a public agency is charged with the knowledge of public contracting law. Perhaps there is even a greater reason for not allowing modification through conduct, as that is a more nebulous concept potentially subject to abuse than an oral modification.

■ Here, likewise, any oral authorization by Cahill for extra work beyond the work contemplated in Amendment No. 5, or supposed modification of the written change order procedure based on the handling of Amendments Nos. 1 through 5, is insufficient to bind the City. The plain language of

the contract limits the City's power to contract to the prescribed method. By ostensibly relying on Cahill's oral authorization or direction to begin or perform extra work without a written change order, P&D acted at its peril. The purpose of including a written change order requirement in a municipal works contract is obviously to protect the public fisc from the type of situation that occurred here. The judgment on the complaint must be reversed.

## B

In support of its modification theory, P&D relies on *Weeshoff Constr. Co. v. Los Angeles County Flood Control Dist.* (1979) 88 Cal.App.3d 579 [152 Cal.Rptr. 19] (*Weeshoff*). *Weeshoff*, however, is unavailing. In *Weeshoff*, the contract was for construction and installation of a storm drain, with a portion of the work to be performed on a state highway. The contract prohibited the use of "temporary resurfacing" of highway lanes, and thus the winning bidder (Weeshoff) included no cost for temporary resurfacing. During construction, however, the flood control district demanded, orally and in writing, that Weeshoff use temporary resurfacing. (*Id.* at pp. 583–584.) Weeshoff refused and the district itself put temporary paving on the highway. Weeshoff then used temporary paving to restore traffic lanes because he believed that otherwise the district might terminate him from the project. The district refused to pay for the extra work and Weeshoff sued. The trial court awarded Weeshoff compensation for the extra work, and the Court of Appeal affirmed on the ground that by ordering the use of temporary pavement, the district orally modified the contract terms. There, however, the parties' contract included a provision allowing extra work to proceed without a fully agreed-upon change order. (*Id.* at pp. 585–586, 588.) Here, the parties' contract contains no such provision. To the contrary, the contract unambiguously prohibits the commencement of extra work without written authorization.

Further, as the court pointed out in *Katsura, supra*, 155 Cal.App.4th at page 111, "the continuing viability of *Weeshoff* is questionable. In pronouncing that 'California decisions have also established that particular circumstances may provide waivers of written "change order" requirements,' and '[i]f the parties, by their conduct, clearly assent to a change or addition to the contractor's required performance, a written "change order" requirement may be waived,' the court cited cases involving private parties, not public agencies. [Citation.] Since its publication 28 [(now 31)] years ago, no case has cited *Weeshoff* for this point. This is understandable as it is contrary to the great weight of authority . . . ."

P&D's reliance on *M. F. Kemper Const. Co. v. City of L. A.* (1951) 37 Cal.2d 696 [235 P.2d 7] (*Kemper*) is also misplaced. In *Kemper*, the city formally accepted a bid for a sewer project after the bidder (Kemper) tried to

withdraw its bid on the ground it inadvertently omitted a line item for $301,769, which represented approximately one-third of the work. When Kemper refused to enter into a contract for the bid amount, the city accepted the next lowest bid. Kemper sued the city to withdraw its bid and cancel its bond, and the city cross-complained for forfeiture of the bond and damages. The trial court cancelled the bid, discharged the bond, and gave the city nothing on its cross-complaint. (*Id.* at pp. 699–700.) The question on appeal was whether Kemper was entitled to relief from its bid on the ground of unilateral mistake.

The California Supreme Court answered the question affirmatively, despite language in the bid form that bidders would not be released on account of errors. (*Kemper, supra*, 37 Cal.2d at p. 703.) The court explained Kemper promptly gave notice of its mistake, and "it would be unconscionable to hold the company to its bid at the mistaken figure. The city had knowledge before the bid was accepted that the company had made a clerical error which resulted in the omission of an item amounting to nearly one third of the amount intended to be bid, and, under all the circumstances, it appears that it would be unjust and unfair to permit the city to take advantage of the company's mistake." (*Id.* at pp. 702–703.) Further, the court noted the city had ample time to award the contract to another bidder without readvertising, and "the city will not be heard to complain that it cannot be placed in statu quo because it will not have the benefit of an inequitable bargain." (*Id.* at p. 703.)

■ Here, we are not concerned with relief from a mistaken bid that caused the municipality no damage. Rather, a contractor seeks a substantial sum of public money for extra work done without following the written change order procedure specified in the contract. P&D relies on the court's comment in *Kemper, supra*, 37 Cal.2d at page 704, that "California cases uniformly refuse to apply special rules of law simply because a governmental body is a party to a contract," in an effort to convince us the law of contract modification in the private sector applies equally to public contracts. While ordinary contract rules apply to public contracts in some contexts, the Supreme Court has explained that "public works contracts are the subject of intensive statutory regulation and *lack the freedom of modification present in private party contracts.*" (*Amelco Electric v. City of Thousand Oaks* (2002) 27 Cal.4th 228, 242 [115 Cal.Rptr.2d 900, 38 P.3d 1120], italics added (*Amelco*).)[4]

---

[4] In *Amelco*, the court held that as a matter of law the abandonment theory of contract liability does not apply against a public agency. The court explained: "In California, the Courts of Appeal have concluded that private parties may impliedly abandon a contract when they fail to follow change order procedures and when the final product differs substantially from the original." (*Amelco, supra*, 27 Cal.4th at p. 235.) The court concluded the theory does not apply

## II

### *P&D's Other Theories of Recovery Also Lack Merit*

#### A

■ P&D contends that even if a written change order was required, it is unsettled whether the lack of a writing automatically eliminates the possibility of recovery under theories of equitable estoppel, waiver and ratification. P&D, however, neglects to advise us it did not raise any of these theories at trial. "As a general rule, theories not raised in the trial court cannot be asserted for the first time on appeal; appealing parties must adhere to the theory (or theories) on which their cases were tried. This rule is based on fairness—it would be unfair, both to the trial court and the opposing litigants, to permit a change of theory on appeal." (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2009) ¶ 8.229, p. 8-155 (rev. # 1, 2009).) Likewise, P&D may not pursue its theory that the City misled it into believing the golf course project's architect would be available to P&D during its work, and it relied on that availability in making its bid and entering into the contract, because it did not raise any misrepresentation theory at trial.

#### B

■ Additionally, P&D asserts the court erred by granting the City's motion for nonsuit on the complaint's causes of action for implied contract and quantum meruit. P&D argues that if we reverse the judgment, we must remand the matter for reinstatement and trial of these claims. We disagree. It is well settled that when a written change order requirement is not met, " 'a private party cannot sue a public entity on an implied-in-law or quasi-contract theory, because such a theory is based on quantum meruit or restitution considerations which are outweighed by the need to protect and limit a public entity's contractual obligations.' " (*Katsura, supra,* 155 Cal.App.4th at pp. 109–110; see *Janis v. California State Lottery Com.* (1998) 68 Cal.App.4th 824, 830 [80 Cal.Rptr.2d 549].) We also reject P&D's contention remand is necessary because the court erred by granting a directed verdict on its cause of action for violation of prompt payment statutes. The issue is moot because P&D is not entitled to payment for any extra work without a written change order.

---

in the public contract context because it "is fundamentally inconsistent with the purpose of the competitive bidding statutes." (*Id.* at pp. 238–239.) The court commented, "It is difficult . . . to ascertain how the general public benefits by allowing a contractor to claim abandonment of the public works contract following completion of the work, and recover for the reasonable value of its work; indeed, just the opposite seems true. Permitting such recovery would appear to unduly punish the tax-paying public." (*Id.* at pp. 239–240.)

## C

██ We also find no merit to P&D's argument the court abused its broad discretion by denying it leave to amend the complaint to add causes of action for breach of the implied covenant of good faith and fair dealing and "breach of the duty to negotiate in good faith." The court's ruling was based on unreasonable delay. P&D did not seek leave to amend until after the trial readiness conference, an amendment would require additional discovery and perhaps result in a demurrer or other pretrial motion, and P&D offered no explanation for the delay. Courts must apply a policy of liberality in permitting amendments at any stage of the proceeding, including during trial, when no prejudice to the opposing party is shown. (*Huff v. Wilkins* (2006) 138 Cal.App.4th 732, 746 [41 Cal.Rptr.3d 754].) "However, ' "even if a good amendment is proposed in proper form, unwarranted delay in presenting it may—of itself—be a valid reason for denial." ' " (*Ibid.*; see *Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, 488 [55 Cal.Rptr.2d 225] ["Where the trial date is set, the jury is about to be impaneled, counsel, the parties, the trial court, and the witnesses have blocked the time, and the only way to avoid prejudice to the opposing party is to continue the trial date to allow further discovery, refusal of leave to amend cannot be an abuse of discretion."].)

P&D asserts it sought leave to amend because it realized the opinion in *Katsura, supra,* 155 Cal.App.4th 104, might bar the complaint's existing causes of action. *Katsura,* however, was decided on August 15, 2007, and P&D did not move to amend its complaint until June 2008. P&D offers no reason for the delay.

## D

Lastly, we address P&D's contention the jury could have found the City breached a *written* provision of the contract. P&D's assertions that "the case went to the jury only on the written contract," and "[t]here is no indication that the jury awarded [P&D] damages based on anything other than the provisions of the parties' written contract" are wrong. (Boldface omitted.) The court erroneously instructed the jury on P&D's contract modification theory, and given the contract's express requirement of a signed change order before the commencement of extra work, the jury's verdict was presumably based on the modification theory.

Moreover, P&D's reliance on paragraph 4 of a document titled "Understandings and Assumptions" (hereafter paragraph 4) included in P&D's scope of work, and attached to the contract, is misplaced. It states: "Services not specifically identified in the scope of services above will be considered

additional work, and *will be authorized* by the City as an *executed amendment to the contract prior to commencement of work.* This work will be based on labor rates of P&D and the project subconsultants at the time of approval by the City." (Italics added.)

At trial, the court provisionally heard parol evidence to determine whether paragraph 4 was reasonably susceptible of the meaning P&D urged. (See *Bill Signs Trucking, LLC v. Signs Family Limited Partnership* (2007) 157 Cal.App.4th 1515, 1521 [69 Cal.Rptr.3d 589].) Moore, P&D's project manager, testified he drafted paragraph 4 with the intent of allowing P&D to perform extra work strictly on Cahill's oral authorization, without any meeting of the minds on price. The court rejected the interpretation as it "in no way square[d] with the language of paragraph 4," which expressly required an executed change order prior to commencement of extra work. The interpretation P&D urged is absurd, as it would essentially give P&D unfettered access to the public fisc, or as the court said, a "blank check."

On appeal, P&D abandons the theory paragraph 4 gave it carte blanche to perform extra work without any agreement on price. Instead, it argues the jury could have found the City breached the "will be authorized" language of paragraph 4 by not negotiating and executing a sixth amendment to the contract in good faith. P&D's complaint, however, did not allege the City breached the contract by failing to negotiate in good faith, and the court properly denied its untimely request to amend the complaint to add such a claim. The theory was not presented to the jury, and thus the verdict could not be based on it.[5]

### III

*Evidentiary Issues on Cross-complaint*

### A

The City also contends we must reverse the judgment insofar as its cross-complaint against P&D for defective work is concerned because the court excluded the testimony of a nonretained expert witness, George Litzinger. We are unconvinced.

■ Code of Civil Procedure section 2034.210 provides: "(a) Any party may demand a mutual and simultaneous exchange by all parties of a list containing the name and address of any natural person, including one who is a party, whose oral or deposition testimony in the form of an expert opinion

---

[5] The City's request that we take judicial notice of the City's Municipal Code is moot.

any party expects to offer in evidence at the trial. [¶] (b) If any expert designated by a party under subdivision (a) is a party or an employee of a party, or has been retained by a party for the purpose of forming and expressing an opinion in anticipation of the litigation or in preparation for the trial of the action, the designation of that witness shall include or be accompanied by an expert witness declaration under Section 2034.260." Under Code of Civil Procedure section 2034.260 (hereafter section 2034.260), the attorney for the party designating a retained expert must submit a declaration that includes a brief narrative statement of the expert's qualifications and the general substance of the testimony he or she is expected to give. (§ 2034.260, subd. (c).)

In its designation of expert witnesses, the City named Stephen Wong, a licensed civil engineer; Mark Hetherington, a geotechnical engineer; and Matt Becica, a civil engineer and general contractor. In accordance with section 2034.260, the designation was accompanied by a declaration with narrative statements and representations regarding the qualifications and expected testimony of the experts. The City expected Wong and Hetherington to give opinions on the applicable standard of care, breach and causation, and Becica to give opinions on the City's damages. The City's designation also listed Litzinger as a nonretained expert. Litzinger, a licensed civil engineer, was the City's construction manager on the golf course project. The designation does not include a declaration stating Litzinger's qualifications or the nature of his expected testimony.

The court limited Litzinger's expert testimony because he was not designated as a retained expert. The court prohibited him from expressing any opinions on the standard of care applicable to P&D, breach or causation. The court relied on the analogous law pertaining to the testimony of treating physicians designated as nonretained experts, presumably as that is the context in which nonretained expert testimony generally arises.[6]

The City asserts the court erred as a matter of law by ruling that only treating physicians may be designated as nonretained experts. The court,

---

[6] The court explained Litzinger could testify, for instance, that "in my capacity as the manager, . . . I did a constructability review of everything and I was . . . tasked with the job of making sure that the actual construction went smoothly. So what I do is I look at all the plans, and if I think any change orders are necessary, I put them into effect and keep ahead of the game." The court elaborated, "He can say I reviewed all the plans. That's my job. I anticipated what I thought was necessary to make this job work in the construction phase, I issued 14 change orders. Here they are, they were all charged to the City. [¶] And then your [retained] expert can say, all of those change orders were based on deficiencies of P&D's work, they fell below the standard of care, and here is why I have this explanation." Litzinger was not allowed to testify that two years prior when the project was underway, "I determined that P&D's plans were defective, and therefore, I did a change order."

however, did no such thing. Rather, the court observed that a "classic example" of a nonretained expert is a treating physician. The court actually gave examples of other percipient witnesses who could be designated nonretained experts, such as plumbers and electricians.

In any event, we are not required to determine whether Litzinger could properly testify as to P&D's standard of care or breach, because to obtain a reversal based on the erroneous exclusion of evidence, the City is required to show a "miscarriage of justice," meaning that "a different result was probable if the evidence had been admitted." (*Karlsson v. Ford Motor Co.* (2006) 140 Cal.App.4th 1202, 1223 [45 Cal.Rptr.3d 265]; see Cal. Const., art. VI, § 13; Evid. Code, § 354.) The City has not met its burden. The City cites only two instances during Litzinger's lengthy testimony in which the court sustained objections to proffered testimony. Litzinger testified P&D had prepared plans for "the water connection under the Wadsworth contract," and he had reviewed the plans. The City then asked him, "And after the review of those plans, did you find it was necessary for [P&D] to prepare those plans?" The court sustained P&D's objection on the ground of impermissible opinion. Later, Litzinger testified the City was charged with a change order for the realignment of the "sewer line for the clubhouse" from the location shown on P&D's plans. The court sustained an objection to the City's question as to whether the realignment was a "redesign" of P&D's original design. The court allowed Litzinger to testify about the change order, but not to characterize the change as a "redesign." These limited instances fall far short of showing a miscarriage of justice.

Further, we cannot determine prejudice without considering the testimony of the City's *retained* experts designated to testify as to P&D's standard of care and breach. In its opening brief, the City ignores the testimony of its retained experts, and in its reply brief, the City admits its "other experts testified that [P&D's] work was below the standard of care." The City does not explain how an additional opinion by Litzinger on P&D's culpability would have changed the result.

## B

Additionally, the City asserts the court erred by excluding certain testimony of Becica, its retained damages expert. The City claims this precluded it "from presenting a large component of its damages claim."

During his deposition, Becica opined that any change order work was per se 20 percent more expensive than work originally scoped in a contract. When asked to justify that figure, he testified: "The 20 percent figure is an amount that I am using in this case. There are no [e]mp[i]rical documents to support it. It is an amount that I've determined as an expert. That is a likely amount that the City has paid as a premium as a result of having to incorporate the change work into the original work scope during the course of construction." Becica admitted he had no information on whether any trades actually charged the City a 20 percent premium on change orders.

P&D brought a motion in limine to exclude this type of testimony at trial. At the hearing, the court wondered, "[W]here does . . . Becica come up with his 20 percent?" The court nonetheless denied the motion. At trial, P&D argued Becica was unqualified to render an opinion on the supposed 20 percent surcharge for change orders. In an offer of proof, the City stated his "general opinion is that in terms of change-order work, generally, it is by its nature more expensive than if it was originally bid," and "[w]hen you take all factors into consideration, he will say the range is between 15 and 25 percent project wide. He will say there are specific highs and lows, but on a project-wide analysis, . . . that's the range." The court excluded the testimony on the ground of lack of foundation.

The standard of review is abuse of discretion. (*Zhou v. Unisource Worldwide* (2007) 157 Cal.App.4th 1471, 1476 [69 Cal.Rptr.3d 273].) We find no abuse of discretion. The City offered no proof that Becica's cost premium opinion had any reasonable basis. "[W]hen an expert's opinion is purely conclusory because unaccompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion, that opinion has no evidentiary value . . . ." (*Jennings v. Palomar Pomerado Health Systems, Inc.* (2003) 114 Cal.App.4th 1108, 1117 [8 Cal.Rptr.3d 363]; see *Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 564 [10 Cal.Rptr.3d 34] ["An expert opinion has no value if its basis is unsound."].)

Further, the City has not shown any prejudice. The City prevailed on only one relatively minor component of its cross-complaint, for which it recovered damages of $6,614.69. On all other claims, the jury rejected the notion P&D breached the applicable standard of care. The City does not specify how Becica's cost premium testimony could have increased its damages. Before damages were assessed, the City had to prove P&D's wrongdoing.

## DISPOSITION

The judgment is reversed insofar as the complaint is concerned. The judgment is affirmed insofar as the cross-complaint is concerned. The City is awarded costs on appeal.

McDonald, J., and Aaron, J., concurred.

The petition of appellant P&D Consultants, Inc., for review by the Supreme Court was denied April 13, 2011, S190154.